UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JACQUELINE TRINIDAD,                    )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )       CIVIL ACTION NO.
                                        )       07-11679-DPW
CITY OF BOSTON and                      )
MICHAEL LOPRIORE,                       )
                                        )
        Defendants.                     )

MEMORANDUM AND ORDER
July 16, 2010

Plaintiff Jacqueline Trinidad ("Trinidad") brought this action against the City of Boston (the "City") and one of its former police officers, Michael LoPriore ("LoPriore"), under 42 U.S.C. § 1983 ("Section 1983") and the Massachusetts Tort Claims Act, MASS. GEN. LAWS ch. 258 §§ 1 *et seq.* ("Chapter 258"). Specifically, Trinidad alleges that LoPriore, while acting under the color of law, forced her to perform sexual acts and that those actions were caused by the City's failure to investigate adequately prior incidents involving LoPriore and discipline him appropriately as a result thereof. The City and Trinidad have moved respectively for summary judgment and partial summary judgment. For the reasons discussed below, I will grant summary judgment in favor of the City and deny Trinidad's motion for partial summary judgment.

Meanwhile, a default has issued as to LoPriore, who has failed to appear in this case. Despite my repeated direction to

do so, counsel for Trinidad has failed to move for default judgment with a submission setting forth and supporting a damage amount.  Consequently, I will enter judgment for Trinidad against LaPriore in the nominal amount of $1.00.

## I. BACKGROUND

### A.   *Incidents Involving LoPriore and Trinidad*

In September 2004, Trinidad, then aged 19, was working as a prostitute in the Boston area.  In the evening, she would stand on Oak Street and Marginal Way and wait for potential clients. At some point in September 2004,[1] Trinidad was solicited by a regular client named "Rick."  Trinidad entered Rick's van and together they drove off to an ATM machine before proceeding to Quincy, Massachusetts.

Upon arriving in Quincy, Rick parked his van and started to perform oral sex on Trinidad.  At that time, LoPriore knocked on the window of the van and flashed a badge from inside his wallet. After Rick opened the door of the van, LoPriore told Rick and Trinidad that he was an undercover police officer and that he had been following them since they stopped at the ATM machine in Boston.

While Rick was merely asked to go home, LoPriore threatened Trinidad that she would be arrested for prostitution.  After

---

[1]   The incidents involving LoPriore and Trinidad occurred some time between September 1, 2004 and September 13, 2004, but no precise date has been offered into evidence.

Trinidad stepped out of Rick's van, she approached LoPriore's
vehicle and was forced into the front passenger seat.  At that
point, LoPriore asked Trinidad "[h]ow much [wa]s a police
officer's discount" and Trinidad responded "40 dollars."
LoPriore said, "No. Nothing or you are getting booked."  He then
violently forced Trinidad's head downward, thereby causing it to
be smashed on the dashboard.  LoPriore then physically forced
Trinidad to perform oral sex.  At the time of the incident,
LoPriore had been limited to administrative duty in the East
Boston police station since May 2004.  In that capacity, LoPriore
had no access to a firearm and was not permitted to be on patrol
in any district of the City of Boston.

Trinidad later testified that, when the first incident
occurred, she did not believe LoPriore was a police officer but
rather a "crazy weirdo" who had a fake badge and was "acting" as
a police officer.  Her belief was based on several factors.
*First*, given her prior experience of being arrested by the
police, she questioned the circumstances of the arrest, i.e.,
while she was performing sex for a fee as opposed to when she
would agree to perform sex for a fee on an undercover officer.
*Second*, again based on her experience, Trinidad did not believe
that, if LoPriore had in fact be following her since Boston, he
would have had jurisdiction to arrest her in Quincy because it
would be outside of his legal jurisdiction.  *Third*, Trinidad

3

suspected that LoPriore's vehicle was not a police vehicle because it was a Honda Civic with a baby seat and a gym bag in the back.  *Lastly*, apart from his badge, Trinidad did not observe any items that would lead her to believe that LoPriore was a police officer.  In fact, LoPriore was in plain clothes and never displayed any other police equipment, such as a firearm or handcuffs.

A few nights later, while Trinidad was working on Marginal Way in Boston, LoPriore drove up with his Honda Civic, flashed his badge, and told her to get in the car.  Once she entered the car, LoPriore told Trinidad, "you know the deal," at which point Trinidad performed oral sex on LoPriore.  That time, however, Trinidad admitted that she was not physically forced to do so.  When asked why she performed oral sex on LoPriore, Trinidad testified that it was because she was scared and that the fact that he showed her his badge again "had nothing to do with it at this point."

During the evening that followed, while Trinidad was walking on Marginal Way, LoPriore again drove up, flashed his badge, and told her to get in the car.  Once Trinidad was in the car, LoPriore told her once again "you know the deal" and Trinidad performed oral sex on him.  During this third incident, Trinidad reached onto the dashboard and stole the wallet that contained his badge.  Shortly thereafter, Trinidad exited LoPriore's

vehicle and gave the wallet to her cousin, who was also working
the street that evening.  Trinidad later testified that, during
the second and third incidents, there was nothing about
LoPriore's clothes or vehicle that would lead her to believe that
he was a police officer.  It was only after she took possession
of his badge that she realized that LoPriore was actually a
police officer.

   A few seconds after handling the wallet, Trinidad observed
LoPriore driving back asking for his wallet.  Because Trinidad
replied that she did not have it, LoPriore requested that she
gave him her purse.  LoPriore emptied the contents of the purse
on the top of his car.  While he returned her wallet to Trinidad,
LoPriore allegedly stole one thousand dollars in cash from her.
Trinidad suspects that, while searching her purse, LoPriore also
took a card with her phone number on it.  Thereafter, LoPriore
called Trinidad on several occasions asking her to return his
wallet in exchange for a certain amount of money.  During one of
these phone conversations, LoPriore told Trinidad that "he was
doing [her] favors in not arresting [her]."

   In the meantime, Trinidad turned LoPriore's wallet over to
her attorney because she wanted LoPriore to stop threatening her.
The Federal Bureau of Investigation was contacted and began an
investigation.  On September 26, 2006, LoPriore was charged, in a
one count misdemeanor Information, with deprivation of rights

under color of law in violation of 18 U.S.C. § 242, *United States v. LoPriore*, Criminal Action No. 06-10301-DPW.  LoPriore pled guilty to this count before me on December 12, 2006.  On March 13, 2007, I entered judgment sentencing LoPriore to the maximum incarcerative penalty for the misdemeanor, twelve months in prison.

**B.  *Prior Incidents Involving LoPriore and Other Female Civilians***

Two prior incidents involving LoPriore and female civilians are relied upon by Trinidad to support her claim of municipal liability.

1.  <u>Incident Involving "Susan Smith"</u>

The first incident involved Susan Smith ("Smith"),[2] who reported to the Boston Police in March 2002 that she had been sexually assaulted by LoPriore.  Lieutenant Detective Gary French ("Lt. French") and Sergeant Detective Lorraine Henshaw ("Sgt. Henshaw"), both from the Boston Police Department's Sexual Assault Unit, were assigned to investigate this incident.  In this capacity, they proceeded to take statements from several witnesses, including Smith, her boyfriend, Tom, her friend, Wendy, as well as others.

During her interview, Smith reported that, on March 14, 2002, she was at a bar in Boston with Tom and Wendy.  When she

---

[2]  Pseudonyms are used in this section of the Memorandum in place of the real name of the complainants and civil witnesses.

left the bar, she claimed that she was not intoxicated but admitted having taken the prescription drug Ceraquil that evening.  As Smith was about to ride on the back of Tom's motorcycle to go home, LoPriore, who was in a marked police cruiser parked outside the bar, allegedly told Tom that Smith could not ride with him in her condition.  At that time, Tom called one of his cousins, who was also a Boston Police officer, and explained the situation.  Tom reported that his cousin told him that LoPriore was off-duty and that he should not be driving Smith home.

After Smith entered the police cruiser, Tom alleges that she tried to escape but LoPriore ordered her back in the car.  Once she got back in the car, Smith asked LoPriore to stop at a CVS, so that she could purchase some cigarettes.  At the CVS, Smith allegedly told the clerk that she was trying to escape from the police officer, who was waiting for her outside.  After leaving CVS, LoPriore drove her to an isolated street and forced her to perform oral sex on him and masturbate him to ejaculation.

After concluding the interviews of Smith and her boyfriend, Sgt. Henshaw collected samples from clothing worn by Smith during the night of the incident.  Thereafter, Sgt. Henshaw identified the police cruiser driven by LoPriore during the night of the incident and collected samples from the vehicle.  The samples tested negative for semen.

On March 30 and April 6, 2002, Sgt. Henshaw interviewed the manager of the CVS where Smith had purchased her cigarettes and the clerk who worked during the night of the incident.  The clerk reported that he had seen a white female in her forties coming into the store to purchase cigarettes that night.  He declared that "the female appeared to him to be under the influence of alcohol or drugs because she was acting weird."  He recalled noticing a white car waiting outside for the female, however he did not know whether it was a police car.

On April 11, 2002, Sgt. Henshaw interviewed Officer Matthews, the officer whom Tom had identified as his cousin and the person he had spoken to during the night of the incident. Officer Matthews stated that he recalled receiving several phone calls from Tom that evening, including one around 2:00 a.m. during which Tom asked him for the name of the officer driving a certain vehicle.  Officer Matthews told Tom that it was LoPriore and thought he heard LoPriore's voice in the back.  However, he denied having told his cousin that LoPriore was not working that night.

On April 16, 2002, Smith's friend, Wendy, agreed to take part in a live interview over the phone but refused to meet in person.  Wendy declared that, when she had arrived late at the bar during the night of the incident, it was almost closing.  She observed Smith sitting on Tom's motorcycle and then get into the

8

police cruiser.  She further stated that she only saw Smith get in the police cruiser once, and that she heard the police officer say, "Get in The Fucking Car."  She declared that she would not, however, be able to identify the police officer.

On the same day, Sgt. Henshaw and Lt. French interviewed LoPriore.  LoPriore admitted that he drove Smith home that night. He alleged, however, that Tom had asked him to do so because Smith was too intoxicated.  In any event, LoPriore denied engaging in sexual misconduct with her.

During the remainder of April 2002, Sgt. Henshaw attempted on numerous occasions to contact Smith to collect a hair sample and ask her further questions but Smith would not return his calls.  Smith eventually informed Sgt. Henshaw that she decided not to pursue criminal charges against LoPriore.  Consequently, the Suffolk County District Attorney's Office informed Lt. French that the prosecution against LoPriore would not go forward because Smith was uncooperative and unwilling to proceed.

On May 14, 2002, Smith's case was assigned to Sergeant Detective Roy Hechavaria ("Sgt. Hechavaria") at the Boston Police Department Internal Affairs Division ("IAD") to determine whether LoPriore had violated Boston Police Department Rule 102 § 4 (neglect of duty), Rule 103A § 12 (unauthorized person in police vehicle), and Rule 102 § 35 (conformance to laws).  Sgt. Hechavaria attempted unsuccessfully to contact Smith and her

boyfriend on numerous occasions.  When he was finally able to reach them on July 2, 2002, Smith and her boyfriend reiterated that they did not wish to cooperate with the investigation.  Sgt. Hechavaria also conducted another interview of LoPriore, who again admitted having driven Smith home that night but denied engaging in sexual misconduct with her.

On August 20, 2002, Sgt. Hechavaria issued a report recommending that the IAD sustain a finding of violation of Rules 102 § 4 and 103A § 12 against LoPriore.  However, because of Smith's unwillingness to cooperate, Sgt. Hechavaria had not been able to investigate fully Smith's allegations of sexual misconduct and therefore recommended that a finding based on a violation of Rule 102 § 35 not be sustained.

### 2.   Incident Involving "Jane Doe"

The second incident involved Jane Doe ("Doe"), who reported that, while she was standing outside of a club in Boston in the early morning of August 4, 2002, LoPriore and his partner forced her into a marked police vehicle, transported her to Charlestown while she lived in Canton, dropped her off on the street and drove away.  Doe did not, however, make any allegations of sexual misconduct on the part of the two officers.

Sergeant Detective Susan F. Handy ("Sgt. Handy") of IAD interviewed Doe, LoPriore, his partner, the owner of the club, and an acquaintance of Doe.  Doe admitted that she was

intoxicated on the night of the incident and that she could have
been under the influence of another substance, citing her lack of
recollection.  The owner of the club reported he had denied the
access to the club to Doe on several occasions that night because
of her condition.  He testified that at some point Smith acted
like a "charging bull" and began to slap him.  After doing so,
Doe turned towards LoPriore's partner who had approached with
LoPriore to assist, and then struck him in the face.

Sgt. Handy determined that, because of Doe's actions,
LoPriore and his partner had put Doe in the police vehicle,
though not placing her under arrest, and dropped her off in
Charlestown.  According to Doe, she told LoPriore and his partner
that she lived in Canton.  However, the officers urged that she
had expressly told them she lived in Charlestown.

In light of these interviews, Sgt. Handy recommended that
the IAD sustain a finding of violation against LoPriore of Rule
102, §§ 3 and 4 (conduct and neglect of conduct), Rule 103, § 8
(patrol officers), and 103-A, §§ 12 and 23 (unauthorized
passenger in vehicle and assigned sector patrol).  However, she
recommended that the IAD not sustain a violation of Rule 102, § 9
(respectful treatment) and Rule 304, § 2 (use of force).

### 3.   Department Discipline

On December 22, 2003, as a result of negotiations between
the Boston Police Department and LoPriore's attorney, LoPriore

entered a settlement agreement for violations of Rules and Procedures of the Boston Police Department in connection with the incidents involving Smith and Doe.  Under this agreement, LoPriore accepted a sixty-day suspension without pay, with twenty days to be served and the remainder to be held in abeyance for one year.  LoPriore had served the twenty-day compulsory suspension by May 21, 2004.

Following completion of this 60-day suspension, LoPriore was placed indefinitely on administrative duty, i.e., assigned to desk duty without access to a firearm.  He remained on administrative duty until his resignation on September 27, 2006.

## C.   *Procedural History*

On September 7, 2007, Trinidad filed a complaint against the City, alleging that the City was aware of prior incidents involving LoPriore, and yet failed to supervise and discipline LoPriore adequately.  Trinidad contended that the City's failure to supervise and discipline LoPriore allowed him to be in a position to deprive her of her civil rights in violation of Section 1983.

On May 19, 2008, Trinidad filed a First Amended Complaint to include a Section 1983 claim against LoPriore.  In a Second Amended complaint filed on September 9, 2008, Trinidad added a count for negligence under Chapter 258 against the City.  In the interim, a notice of default was issued to LoPriore on September 10, 2008.

The City filed a motion for summary judgment on November 23, 2009.  After allowing extensions of time within which to file Trinidad's opposition to the City's motion for summary judgment, I ordered that the opposition be filed by May 7, 2010.  On May 12, 2010 Trinidad filed a third motion for extension of time, alleging that "the issues in the motion were complex and more time was needed to complete the opposition" and that day finally filed her opposition to the City's motion for summary judgment as well as a cross-motion for partial summary judgment.  The argument made by Trinidad in her cross-motion for partial summary judgment is that, because LoPriore pled guilty in the prior criminal proceeding, *see* Section I.A. *supra*, no genuine issue of material fact exists as to whether LoPriore acted under the color of law.

In an effort to bring the matter to conclusion, I have twice directed plaintiff's counsel to submit a supported motion of default judgment in light of the default entered nearly two years ago against LaPriore on September 10, 2008.  On May 5, 2009, I directed that a motion for default judgment be filed against LoPriore by May 19, 2009.  No such motion was filed, however.  At the hearing on the summary judgment motions on June 16, 2010, I again directed plaintiff's counsel to submit a motion for default judgment supporting the plaintiff's damage claims.  After colloquy with counsel, I set the deadline for the filing of that

motion as July 9, 2010.  Plaintiff's counsel has failed to meet
that deadline as well and still has not filed for default
judgment.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law."
FED. R. CIV. P. 56(c).  "An issue is 'genuine' if the evidence of
record permits a rational factfinder to resolve it in favor of
either party."  *Borges v. Serrano-Isern*, 605 F.3d 1, 4 (1st Cir.
2010).  "A fact is 'material' if its existence or nonexistence
has the potential to change the outcome of the suit."  *Id*. at 5.

When ruling on a motion for summary judgment, "a district
court must take the facts in the light most favorable to the
nonmoving party, drawing all reasonable inference therefrom to
that party's behoof."  *P.R. Am. Ins. Co. v. Rivera-Vásquez*, 603
F.3d 125, 129 (1st Cir. 2010).  Nonetheless, "[w]here, as here,
the parties have filed cross-motions for summary judgment [and
partial summary judgment], the court must 'determine whether
either of the parties deserves judgment as a matter of law on
facts that are not disputed.'"  *Estrada v. Rhode Island*, 594 F.3d
56, 62 (1st Cir. 2010) (quoting *Barnes v. Fleet Nat'l Bank, N.A.*,
370 F.3d 164, 170 (1st Cir. 2004)).

### III. DISCUSSION[3]

**A.   *Section 1983 Claim*[4] *(Count I)***

Trinidad alleges that, in violation of Section 1983, the City has shown a deliberate indifference to her Fourth and Fourteenth Amendment rights by (1) failing to supervise appropriately officers who are prone to make illegal detentions, use unreasonable force, and deprive citizens of the due process right to bodily integrity, (2) tolerating a custom and practice in which officers commit these types of constitutional violations, and (3) failing to investigate incidents adequately where such violations are involved.

---

[3]  In light of the notice of default issued as to LoPriore, I will focus my analysis in this memorandum principally on the claims brought by Trinidad against the City, i.e., Section 1983 (Count I) and Chapter 258 (Count III) which are the subject of the cross motions for summary judgment now before me.  I note, however, that the Section 1983 claim brought by Trinidad against LoPriore (Count II) has an essential element equally applicable to LoPriore – color of state law – discussed at length in Section III A.1.b. *infra*.  As a guard against improvident grant of a default judgment regarding LoPriore, I examine the question of color of law more broadly there than would otherwise be necessary if addressing the issue as it bears solely upon the City of Boston.

[4]  Section 1983 provides, in relevant part, that:

> Every person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

15

As a general proposition, a municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v., Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). "[I]n other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. Rather, "it is when execution of a government's policy of custom . . . inflicts the injury" and when the "official policy [i]s the moving force of the constitutional violation" that the municipality is responsible under Section 1983. *Id.* at 694.

It is well-settled in the First Circuit that, to establish municipal liability under Section 1983, there must be a finding of two preliminary elements: "first, that plaintiff's harm was caused by a constitutional violation, and second, that the City be responsible for that violation, an element which has its own components."[5] *Young v. City of Providence*, 404 F.3d 4, 25-26 (1st Cir. 2005).

1.  <u>Constitutional Violation</u>

To establish liability under Section 1983, Trinidad must first prove the commission of an underlying constitutional

---

[5] The type of *Monell* claims at issue here - based on deficient investigation and supervision that helped cause the constitutional violation suffered by Trinidad - is distinct from another type of claim where the municipal policy itself is alleged to have violated federal rights or authorized the violation of such rights. *Young v. City of Providence*, 404 F.3d 4, 26 n.18 (1st Cir. 2005) (citing *County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 406-07 (1997)). The standard applicable for these two types of claims is different. *Id.*

violation by LoPriore.  Here, Trinidad argues that LoPriore deprived her, while acting under the color of law, of her due process right to bodily integrity, and her right to be free from illegal detentions and unreasonable force, in violation of the Fourth and Fourteenth Amendments.  Before turning to the existence of a constitutional violation, I must first address the effect, if any, of LoPriore's guilty plea in the prior criminal proceeding.

　　　a.　*Effect of LoPriore's Guilty Plea*

　　　At the outset, Trinidad argues that the issue whether LoPriore acted under the color of law is barred by the doctrine of collateral estoppel because of LoPriore's guilty plea in the prior criminal proceeding.

　　　Federal courts are prepared to recognize res judicata principles in federal question cases.  "It is well-established that the doctrine of collateral estoppel, or issue preclusion, applies in civil rights actions brought pursuant to 42 U.S.C. § 1983." *Johnson v. Mahoney*, 424 F.3d 83, 93 (1st Cir. 2005).  As a matter of federal common law:

> A party seeking to invoke the doctrine of collateral estoppel must establish that (1) the issue sought to be precluded in the later action is the same as that involved in the earlier action; (2) the issue was actually litigated; (3) the issue was determined by a valid and binding final judgment; and (4) the determination of the issue was essential to the judgment."

*Ramallo Bros. Printing, Inc. v. El Dia, Inc.*, 490 F.3d 86, 90 (1st Cir. 2007).

To be sure, courts, applying Massachusetts law, do not extend collateral estoppel effect to judgments entered upon a guilty plea in a state criminal proceeding to a subsequent civil case. *See Aetna Cas. & Sur. Co. v. Niziolek*, 481 N.E.2d 1356, 1364 (Mass. 1985) ("A guilty plea has no preclusive effect in subsequent civil litigation"); *see also United States v. One Parcel of Real Prop.*, 900 F.2d 470, 473 (1st Cir. 1990) ("it is pellucid that the guilty pleas of claimants should not have been given collateral estoppel effect by the district court") (discussing *Niziolek*).

However, LoPriore pled before me in federal court to deprivation of rights under color of law in violation of 18 U.S.C. § 242. *See* Section I.A. *supra*. The res judicata effect of his guilty plea is therefore a matter of federal common law. When, as here, there has been "a plea of guilty in a federal prosecution for a federal offense, followed by a federal question action for damages in federal court[,] [f]ederal courts should be free to follow their own rules, regardless of any state practice." 18B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 4474.1 at 466 (2d ed. 2002); *see also Ramallo*, 490 F.3d at 89 (Because judgment "was entered by a federal court exercising federal question jurisdiction, the

applicability of res judicata and collateral estoppel is a matter of federal law."). Federal Courts of Appeals, including the First Circuit, applying federal law, have accorded preclusive effect to federal guilty pleas in such subsequent federal civil proceedings. *See*, *e.g.*, *United States v. Real Prop. Located at Section 18*, 976 F.2d 515, 519 (9th Cir. 1992) ("it is settled law in this circuit that a guilty plea may be used to establish issue preclusion in a subsequent civil suit"); *Manzoli v. Comm'r of Internal Revenue*, 904 F.2d 101, 105 (1st Cir. 1990) (observing "that a 'guilty plea is as much a conviction as a jury trial'") (citation omitted); *Appley v. West*, 832 F.2d 1021, 1026 (7th Cir. 1987) ("[A] guilty plea may be used to establish issue preclusion in a subsequent civil suit."); *Gray v. Comm'r of Internal Revenue*, 708 F.2d 243, 246 (6th Cir. 1983) ("A guilty plea is as much a conviction as a conviction following jury trial."); *United States v. Podell*, 572 F.2d 31, 35 (2d Cir. 1978) ("It is well-settled that a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel . . . in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case."). LoPriore's conviction upon a guilty plea before me preclusively determined as to LoPriore that he acted under the color of law when allegedly depriving Trinidad of her constitutional rights.

But Trinidad's motion for partial summary judgment on the

question of color of state law against the City of Boston
stumbles at the threshold.   While the applicability of collateral
estoppel against LoPriore personally on the under color of state
law issue is appropriate because it was established as an
essential element of the criminal judgment entered against him,
collateral estoppel cannot be applied offensively against the
City of Boston because it has had no opportunity to contest the
issue.   *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331
(1979) (where "the application of offensive estoppel would be
unfair to a defendant, a trial judge should not allow the use of
offensive collateral estoppel"); *Acevedo-Garcia v. Monroig*, 351
F.3d 547, 275 (1st Cir. 2003) (noting that for offensive
collateral estoppel to apply defendants must have "received a
full and fair opportunity to litigate their claims" in the first
trial) (citation omitted).

Consequently, I turn to a discussion of whether,
independently of collateral estoppel principles, the summary
record before me, which the City of Boston has had an opportunity
to confront and contest, establish as a matter of law that
LoPriore deprived Trinidad of her constitutional rights while
acting under the color of law.

> b.   *Deprivation of Trinidad's Constitutional Rights by
>       LoPriore While Acting Under Color of Law*

Traditionally, "acting under color of state law requires
that the defendant in a § 1983 action have exercised power

'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).  In the First Circuit, "whether a police officer is acting under color of state law turns on the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." *Martinez v. Colon*, 54 F.3d 980, 986 (1st Cir. 1995).  Such an evaluation requires an assessment of the officer's "conduct in light of the totality of the surrounding circumstances." *Id.* at 987.  Although the subjective reactions of the victim will be accorded some evidentiary relevance for purposes of the color of law analysis, "the primary focus of the color of law analysis must be on the conduct of the police officer." *Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 47 (1st Cir. 1999); *Martinez*, 54 F.3d at 986 ("The key determinant is whether the actor, at the time in question, purposes to act in an official capacity or to exercise official responsibilities pursuant to state law.").

One relevant factor in determining whether the defendant acted under the color of law is whether he has acted under "pretense of law." *Parrilla-Burgos v. Hernandez- Rivera*, 108 F.3d 445, 449 (1st Cir. 1997).  "Action occurs under pretense of law when an individual imbued with official authority purports to

21

exercise that authority when actually acting wholly outside of it." *Id*.  However, "the challenged conduct [must be] related in some meaningful way either to the officer's governmental status or to the performance of his duties." *Martinez*, 54 F.3d at 987. In order words, "the acts of state officials 'in the ambit of their personal pursuits' are not state action." *Id*. at 986 (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945)). "Therefore, it is not enough for an individual merely to purport to exercise official power in order to trigger § 1983 liability, but rather the individual must actually be engaged in the abuse of official power granted by the government." *Parrilla-Burgos*, 108 F.3d at 449.

The parties discuss three main cases, in which the First Circuit addressed the scope of police conduct allegedly carried out under the color of law.

*First*, in *Martinez*, the court held that an on-shift officer who shot and maimed a fellow officer was engaged in a "personal frolic" and not acting under color of state law.  54 F.3d at 987. Throughout the encounters, the officer had never asserted his authority as a police officer.  *Id.*  The court held that, in a case of an officer against another officer dispute, the limited indicia of state action, i.e., use of police weapon, on-shift status and uniform, were not enough to establish that the officer exercised, or purported to exercise, any power possessed by virtue of law.  *Id.* at 988.

22

*Second*, in *Parilla-Burgos*, a police officer shot and killed a bar patron during a fight outside of the bar.  108 F.3d at 446-47.  At that time, the officer was on medical leave and, although he was not in uniform, he was carrying police identification and his weapon.  *Id*. at 446.  The court concluded that, while some factors weighed in favor of finding that the officer was acting under color of law by purporting to act in his official capacity, i.e., comments that the officer was in the bar to keep the peace and his display of his identification, most of the officer's conduct demonstrated that he was acting in a private capacity.  *Id*. at 450-51.  In particular, "[t]his conclusion was premised on the fact that the final interchange between the officer and the victim involved an invitation to go outside the bar to settle their differences and the officer's failure to make any further pretense that he was acting as a police officer thereafter." MODERN FEDERAL JURY INSTRUCTIONS – CIVIL § 87-71 at 87-93 (Rel. 52A as of 2010).

*Third*, in *Barreto-Rivera*, an on-duty police officer who was in uniform and patrolling in his police cruiser attempted to stop an individual who was driving home and demanded from him his license and registration.  168 F.3d at 44.  The two men began to fight, the officer forced the individual to submit with the use of his nightstick and then shot and killed the individual with his service weapon.  *Id.*  In light of the nature and

circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties, the court vacated the district court's entry of summary judgment because it was "unwilling to say that [the officer]'s conduct was so clearly personal in nature that a jury could reach only one outcome." *Id.* at 48.

MODERN FEDERAL JURY INSTRUCTIONS captures the distinctions and the governing principles with a model instruction providing that:

> In order for an act to be under color of state law, the plaintiff must prove that the defendant here was purporting or pretending to be lawfully exercising his official power when he committed the act, even if, as plaintiff claims, defendant was misusing that power. By contrast, if a state official committed a wrongful act while he was purporting to be acting in his personal capacity, he would not be acting under color of state law.

5 MODERN FEDERAL JURY INSTRUCTIONS – CIVIL § 87-71 at 87-90.

As otherwise stated in its commentary on this instruction, following a discussion of First Circuit "under color of state law" case law, MODERN FEDERAL JURY INSTRUCTIONS observes that:

> It is important to differentiate action by a state officer in pursuit of private aims from misuse of official power by a state official who is motivated by personal aims.  It is not the source of the officer's *motivation*, personal or official, but rather the source of his *authority* in taking the action that is at issue in a section 1983 claim.  *Id.* at 87-93.

Applying these teachings, I find, as a matter of law, that LoPriore did act under the color of law during the incidents involving Trinidad.  LoPriore presented himself as an undercover

24

police officer and flashed his badge during all three incidents.
Indeed, it was precisely Trinidad's seizure of this artifact of
official authority which led to the underlying criminal case.
LoPriore expressly threatened to arrest Trinidad for prostitution
if she refused to perform sexual acts on him.  During the very
first incident, LoPriore asked Trinidad whether she knew what the
police discount was and, after she replied 40 dollars, he said
that it was "[n]othing or [she was] getting booked."  Later on,
he also told her during a phone conversation that "he was doing
her favors by not arresting her."  Throughout, he was purporting
to be executing his official power in his interactions with
Trinidad.

Reviewing the nature and circumstances of LoPriore's conduct
and the relationship of that conduct to the performance of his
official duties, *see Martinez*, 54 F.3d at 986, while taking the
evidence in the light most favorable to the City - such as
Trinidad's subjective initial belief that he was doing so on what
appeared to be a bizarre personal frolic - I find that no genuine
issue of material fact exists regarding the proposition that
LoPriore's conduct was undertaken by him as a police officer
purporting to exercise power possessed under state law.

    2.   <u>Attribution to the City</u>

The second prong of the municipality test under section 1983
requires three elements: (1) "the alleged municipal action at

issue must constitute a 'policy or custom' attributable to the City;" (2) "the municipal policy or custom actually have caused plaintiff's injury;" and (3) "the municipality possessed the requisite level of fault, which is generally labeled in these sorts of cases as 'deliberate indifference.'" *Young*, 404 F.3d at 26.

> a.   *Existence of "Policy or Custom" Attributable to the City*

A "policy or custom" attributable to the City means that it is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Estate of Bennett v. Wainwright*, 548 F.3d 155, 177 (1st Cir. 2008) (quoting *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989)).  In assessing the existence of such "policy or custom," the court may look at whether the City's disciplinary practices demonstrate a broad failure to supervise and discipline its officers. *Bordanaro*, 871 F.2d at 1159-60.  Here, Trinidad failed to produce any evidence of the City's failure to supervise and discipline its officers and investigate incidents related to the misconduct of its officers other than the allegations involving LoPriore.  In failing to do so, Trinidad falls short of showing that such failure was so widespread or so well-settled as

to be a custom or practice.[6]

        b.   *Deliberate Indifference*[7]

In addition to proving that a failure to supervise, discipline, or investigate was attributable to the City, Trinidad must also establish that such failure amounts to a "deliberate indifference" to her constitutional rights. *See DiRico v. City of Quincy*, 404 F.3d 464, 468 (1st Cir. 2005) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Only if there were such deliberate indifference could the City be held liable under Section 1983. To succeed under this "exceptionally stringent" standard, Trinidad must show that "the City ha[s] disregarded a known or obvious risk of serious harm from its failure" to

---

[6] I note that on March 11, 2010, Trinidad filed a motion to compel the production of documents related to the reporting and handling of sexual assault allegations by the Boston Police Department for a period of ten years prior to the incident alleged in this case. Because the City's motion for summary judgment was pending at the time, the relief sought by Trinidad was effectively a motion under Federal Rule of Civil Procedure 56(f). One who seeks to invoke the benefits of that rule must show "(i) good cause for his inability to have discovered or marshalled the necessary facts earlier in the proceedings; (ii) a plausible basis for believing that additional facts probably exist and can be retrieved within a reasonable time; and (iii) an explanation of how those facts, if collected, will suffice to defeat the pending summary judgment motion." *Mir-Yépez v. Banco Popular de P.R.*, 560 F.3d 14, 16 (1st Cir. 2009) (quoting *Rivera-Torres v. Rey-Hernández*, 502 F.3d 7, 10 (1st Cir. 2007)). Finding that Trinidad failed to make such a showing, I denied the motion to compel on April 23, 2010.

[7] While causation and deliberate indifference are separate requirements, they are often intertwined. *Young*, 404 F.3d at 26.

adequately investigate incidents involving constitutional violations by officers as well as its failure to supervise and discipline such officers. *Young*, 404 F.3d at 28. "Such knowledge can be imputed to a municipality through a pattern of previous constitutional violations." *Id.* However, even in the absence of such pattern, municipality liability can still attach if the violation of a federal right is "a highly predictable consequence" of the City's alleged failures. *Id.* (quoting *County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997)).

Here, I find that Trinidad has failed to show "deliberate indifference" on the part of the City. To the contrary, even taking the evidence in the light most favorable to Trinidad, the evidence contained in the record establishes that both of the prior incidents upon which Trinidad purports to rely were fully investigated by the City and that LoPriore was adequately supervised and disciplined as a result thereof.

In particular with respect to the first incident, the City conducted a thorough investigation of the allegations made by Smith. Several witnesses, including Smith's boyfriend, her friend, her boyfriend's cousin as well as the manager and the clerk of the CVS where Smith had purchased cigarettes during the night of the incident, were interviewed. In addition, samples were taken both from the clothing Smith was wearing and from the police cruiser driven by LoPriore that night. All samples tested

negative for semen.  Shortly thereafter, Smith informed the officers that she decided not to press charges against LoPriore and that she would not cooperate with the investigation any further.  Sgt. Hechavaria explained that it was because of Smith's refusal to cooperate that he had not been able to fully investigate her allegations of sexual misconduct and that, as a result, he recommended that a violation for non-conformance to the laws not be sustained against LoPriore.  Nevertheless, Sgt. Hechavaria recommended that a number of other violations be sustained against LoPriore, including neglect of duty and unauthorized person in police vehicle.

Likewise, the investigation conducted with respect to the second incident was thorough and did not demonstrate a "deliberate indifference" on the part of the City.  At the outset, I note that, contrary to the first incident, no allegations of sexual misconduct on the part of LoPriore were made in connection with the second incident.  Once again, the police officers in charge of the investigation interviewed several witnesses, including Doe, LoPriore, his partner, the owner of the club, and an acquaintance of Doe.  These interviews raised suspicions about Doe's allegations.  *First*, Doe admitted that she could not recall the night of the incident with particularity because she was intoxicated and could have been under the influence of another substance.  *Second*, the owner of

the club reported that, after being denied access to the club on several occasions the night of the incident, she had become violent with him and with LoPriore's partner.  It appears that it was those acts of violence, which lead LoPriore and his partner to force her into the police cruiser and drive her to Charlestown, the town in which she allegedly told the officers she lived.  In light of these interviews, Sgt. Handy recommended that the IAD sustain a number of violations against LoPriore, including neglect of conduct and unauthorized passenger in vehicle.  However, Sgt. Handy recommended that the IAD should not sustain a violation in connection with disrespectful treatment and use of force.

As a result of these two incidents, LoPriore was disciplined by the City of Boston, which imposed a sixty-day suspension without pay, with twenty days to be served and the remainder to be held in abeyance for one year as well as a permanent placement on administrative duty as of May 21, 2004.  By imposing this sanction on LoPriore, the City cannot be said to have disregarded "a known or obvious risk of serious harm."  *Young*, 404 F.3d at 28.  To the contrary, placing LoPriore on administrative duty appeared, at the time, to be an adequate and measured sanction to known and knowable conduct by LoPriore and adequately designed to prevent the recurrence of the type of violations arising out of the two prior incidents.

Trinidad attempts to avoid the lack of evidence here regarding custom and practice and deliberate indifference by the City of Boston by citing to *Arnold v. City of San Antonio*, No. 07-CA-877-XR, 2009 U.S. Dist. LEXIS 32744 (W.D. Tex. March 20, 2009).  In *Arnold*, the plaintiff sued the municipality under Section 1983 after she was raped by a police officer.  The plaintiff alleged that the City of San Antonio was aware of numerous "indiscretions" and "deviant conduct" by the defendant, but nevertheless retained him as a police officer.  *Id.* at *2. In finding summary judgment inappropriate, the court found that "a material fact issue [existed] regarding whether a similar claim (knowledge that [defendant] was committing statutory rape of a 16 year old) should have placed the city on notice that a substantial risk of serious harm existed."  *Id.* at *21.  However, unlike the case before me, no disciplinary measures had ever been taken by the City of San Antonio prior to the incident.  This fact alone renders Trinidad's reliance on *Arnold* misplaced.

Under these circumstances, I find that no reasonable jury could conclude that the City of Boston's investigation of these two incidents, as well as the discipline imposed on LoPriore as a result thereof, demonstrate that it acted in "deliberate indifference" of Trinidad's constitutional rights.  Having found that no genuine issue of material fact exists with respect to

31

Trinidad's Section 1983 claim as to the City of Boston, I will grant summary judgment in favor of the City as to Count I.[8]

**B.   *Chapter 258 Claim (Count III)***

Trinidad alleges negligence on the part of the City in failing to properly supervise and discipline its police officers, in violation of Chapter 258.

Section 2 of the Chapter 258 states that "[p]ublic employers shall be liable for injury . . . caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment."  MASS. GEN. LAWS ch. 258 § 2.  However, the City argues that such a claim here is barred under Section 10(j) of Chapter 258, which prohibits claims against public employers based on:

> any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not *originally caused* by the public employer or any other person acting on behalf of the public employer.

MASS. GEN. LAWS ch. 258 § 10(j) (emphasis added).  The Supreme Judicial Court has observed that Section 10(j) forecloses liability "for failures to prevent or diminish harm," and that "to interpret . . . 'originally caused' conditions, to include

---

[8]   Having concluded (1) that the alleged "policy or custom" was not attributable to the City, *see* Section III.A.2.a. *supra*, and (2) that the City did not act in "deliberate indifference" of Trinidad's constitutional rights, I need not discuss any further whether the City "actually caused" the alleged constitutional violation.

conditions that are, in effect, failures to prevent harm, would undermine that principal purpose." *Brum v. Town of Dartmouth*, 704 N.E.2d 1147, 1155 (Mass. 1999). Therefore, the "original cause" language has been construed to require "an affirmative act (not a failure to act) by a public employer that creates the 'condition or situation' that results in harm inflicted by a third party." *Kent v. Commonwealth of Mass.*, 771 N.E.2d 770, 775 (Mass. 2002). For there to be liability despite the limiting language of Section 10(j), the act of the public employer "must have materially contributed to creating the specific 'condition or situation' that resulted in the harm." *Id.* at 775-76. It is clear that the bar provided by section 10(j) was intended to apply quite expansively. *See also Jacome v. Commonwealth*, 778 N.E.2d 976, 979 (Mass. App. Ct. 2002) (noting the legislature's intent to immunize the Commonwealth from "*any* claim for a loss not originally caused by the public employer").

The City of Boston cannot be held liable under Chapter 258 for failing to prevent or diminish the situation that led to harmful consequences for Trinidad, unless affirmative acts of the City or those of an employee acting on its behalf "originally caused" that situation. In an attempt to satisfy this requirement, Trinidad argues that the City's decision to suspend LoPriore for a period of twenty days and its decision to allow him to keep his badge were affirmative acts, which "originally

caused" LoPriore to be in a position to use his power as a police
officer to sexually assault her.  However, Trinidad omits to
mention the fact that the City placed LoPriore on administrative
duty as of May 21, 2004.  Therefore, while LoPriore was allowed
to keep his badge, he was not allowed to be on patrol.  At that
point, it was not unreasonable for the City to believe that
LoPriore's placement on administrative duty would be a sufficient
measure to prevent further misconduct on his part, in particular
violations involving misconduct in dealing with female civilians.
This is especially true in light of the evidence in two prior
incidents relied upon by Trinidad, where the allegations made in
connection with the first incident were never definitively
resolved due to Smith's unwillingness to cooperate and where the
second incident did not involve allegations of sexual misconduct
at all.

    Under these circumstances, I conclude that the City's
affirmative acts are too remote to be characterized as the
"original cause" of Trinidad's injury.  This finding is
consistent with the Supreme Judicial Court's instruction in *Brum*
that courts should not adopt "an interpretation of the statute
that construes the words 'originally caused' so broadly as to
encompass the remotest causation and preclude immunity in nearly
all circumstances."  704 N.E.2d 1154.  Having found that no
genuine issue of material fact exists as to Trinidad's Chapter

258 claim,[9] I grant summary judgment in favor of the City as to

Count III.[10]

---

[9] I also note that, to the extent that Trinidad attempts to hold the City liable on the theory that LoPriore acted as an employee on behalf of the City, the claim is also unavailing. Intentional tort claims are separately barred by Chapter 258. *See* MASS. GEN. LAWS ch. 258, § 10(c) (barring "any claims arising out of an intentional tort"). To the extent that Trinidad seems to suggest LoPriore's misconduct was negligent, the claim fails as a matter of law because it cannot be said that LoPriore's alleged abuse of Trinidad was made in the "scope of his office or employment" as required under Section 2 of Chapter 258. *See Doe v. Old Rochester Reg'l Sch. Dist.*, 56 F. Supp. 2d 114, 121 (D. Mass. 1999) ("That some of the alleged abuse occurred on School District property does not mean that [teacher]'s acts came within the scope of his employment-that is, that it was associated in any material way with the work he was hired to perform or was motivated by a purpose to serve his employer.); *see also Canty v. Old Rochester Reg'l Sch. Dist.*, 54 F. Supp. 2d 66, 71 n.6 (D. Mass. 1999) ("Sexual misconduct, especially sexual assault and rape, by an employee is not considered an act performed within the scope of his or her employment.").

[10] The City has also argued, in support of its motion for summary judgment, that Trinidad failed to present her Chapter 258 claim to the City within two years after the cause of action arose as required under MASS. GEN. LAWS ch. 258 § 4. Because I find that Trinidad's Chapter 258 claim is barred under Section 10(j), I need not address this issue any further. For purposes of completeness however, I note that her presentment to the City appears to have been made in a timely fashion, at least as to some theories under discovery rule principles. Massachusetts law recognizes that "a cause of action accrues when 'an event or events have occurred that were reasonably likely to put the plaintiff on notice that someone may have caused her injury.'" *Donovan v. Philip Morris USA, Inc.*, 914 N.E.2d 891, 903 (Mass. 2009) (quoting *Bowen v. Eli Lilly & Co.*, 557 N.E.2d 739, 741 (Mass. 1990)). While the incidents between Trinidad and LoPriore occurred in September 2004, Trinidad could not reasonably have raised the *City's* alleged failures to investigate prior incidents or to supervise or discipline its police officers before she learned of the prior incidents involving LoPriore in August 2007.

**C.   *Judgment as to LoPriore (Count II)***

Despite repeated efforts to get Plaintiff's counsel to
provide a showing of damages as to LoPriore through the filing of
a motion for default judgment, I find that Plaintiff's counsel
continues to neglect to meet deadlines, even those established
with counsel's input.  For nearly two years, there has been
outstanding a court ordered obligation imposed on Plaintiff's
counsel to submit papers supporting a default judgment
establishing a damage figure on what I find to have been a
Section 1983 violation by LoPriore.  No such submission has been
made.  I am, at this point, left through counsel's neglect to
bring this case to judgment by simply assessing nominal damages
of $1.00 in favor of LoPriore.  *Cf. Campos-Orrego v. Rivera*, 175
F.3d 88, 99 (1st Cir. 1999).

## IV. CONCLUSION

For the reasons discussed more fully above, I DENY
Plaintiff's cross-motion for partial summary judgment (Dkt. No.
84.)[11] and GRANT Defendant's motion for summary judgment.  (Dkt.
No. 69.).  I direct the Clerk to enter judgment for plaintiff
against defendant LoPriore in the amount of $1.00 on Count II and

---

[11]   I note that Plaintiff failed to file her cross-motion
for partial summary judgment separate from her memorandum in
support of this motion.  Therefore, the entry docket for the
motion is that of the memorandum itself, number 84.

for defendant City of Boston against plaintiff on Counts I and III.

      **_/s/ Douglas P. Woodlock_**
      DOUGLAS P. WOODLOCK
      UNITED STATES DISTRICT JUDGE